IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HANKIN FAMILY PARTNERSHIP, et al.,  :
                                  :     CIVIL ACTION
             Plaintiffs,     :
                                    :     NO. 01-1622
            v.               :
                                    :
UPPER MERION TOWNSHIP, et al.,     :
                                  :
             Defendants.     :

## OPINION

**Slomsky, J.**                                             **January 5, 2012**

### TABLE OF CONTENTS

I.     INTRODUCTION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    The Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.    Attempts to Rezone the Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     D.    1998-1999 Validity Challenge Before the Zoning Hearing Board . . . . . . . . . . . . 6
          1.    Prior Rezoning Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.    Similarly Situated Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          3.    Evidence of Unjustifiable Conduct and Self-Dealing. . . . . . . . . . . . . . . 10
          4.    Reasons for Denying the Request to Rezone. . . . . . . . . . . . . . . . . . . . 12
          5.    Zoning Hearing Board Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     E.    State Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     F.    Federal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          1.    Defendants' Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          2.    Plaintiffs' Motion for Partial Summary Judgment . . . . . . . . . . . . . . . . . 17
          3.    Defendants' Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . 18

III.   LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     A.    Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     B.    Count I: Equal Protection Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          1.    There Is a Genuine Issue of Material Fact Whether Plaintiffs Were Treated
               Differently from Other Similarly Situated Land Owners . . . . . . . . . . . . 23

i

2.    There Is a Genuine Issue of Material Fact Whether Defendants Acted with Wrongful Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3.    There Is a Genuine Issue of Material Fact Whether There Was a Rational Basis for Defendants' Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.    Counts II and III: Substantive Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1.    There Is a Genuine Issue of Material Fact Whether Actions of the Board of Supervisors and the ZHB Deprived Plaintiffs of Substantive Due Process.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

a.    Plaintiffs' Property Interest Is Protected by the Fourteenth Amendment... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

b.    There Is Sufficient Evidence to Allow a Reasonable Jury to Conclude that Actions of the Board of Supervisors and the ZHB "Shock the Conscience".. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

D.    Counts V and VI: Fifth Amendment Takings Claims. . . . . . . . . . . . . . . . . . . .  44

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## I.    INTRODUCTION

On April 3, 2001, Plaintiffs Thomas Timoney, Esquire[1] and Realen Valley Forge Greenes

Associates ("Realen") commenced this action under 42 U.S.C. § 1983 alleging denials of equal

protection (Count I) and due process (Counts II, III, and IV), and a violation of the Takings

Clause of the Fifth Amendment to the U.S. Constitution (Counts V and VI).[2]   Named as

Defendants on each count were Upper Merion Township, the Upper Merion Township Board of

Supervisors, and the Upper Merion Township Zoning Hearing Board (collectively

"Defendants").   This action was filed after the Zoning Hearing Board ("ZHB") denied Realen's

challenge to the validity of an Upper Merion Township Zoning Ordinance that designated as

"agricultural" a 135-acre plot of land located in Upper Merion Township (the "Property").

On September 28, 2010, Defendants filed a Motion for Summary Judgment.   (Doc. No.

141.)  On February 11, 2011, Plaintiff Timoney filed a Memorandum of Law in Opposition to

Defendants' Motion for Summary Judgment.  (Doc. No. 164.)  Additional filings were made in

---

[1]  Thomas J. Timoney was appointed Receiver of the Hankin Family Partnership.  Mr. Timoney passed away in January 2011.  The Montgomery County Court of Common Pleas appointed Herman J. Weinrich, Esquire, as his replacement.  For purposes of continuity, the Receiver shall be referred to as Timoney throughout this Opinion.  This reference encompasses Receiver Weinrich.

[2]  It is important to note that although Plaintiff Timoney and Plaintiff Realen filed the instant matter together in federal court, the relationship between Timoney and Realen has become strained, as described elsewhere in this Opinion and in this Court's separate Opinion on Plaintiff  Timoney's Motion for Leave to Supplement the First Amended Complaint.  (Doc. No. 115.)  If this latter Motion were granted, Plaintiff Realen would have become a cross-claim defendant in this case.  However, because the Court is denying Plaintiff Timoney's Motion for Leave to Supplement the First Amended Complaint, which contains the cross-claims against Realen, the Court will refer to both Plaintiffs Timoney and Realen throughout this Opinion as the Plaintiffs.

1

support of and in opposition to the Motion.[3]  After consideration of transcripts, exhibits, and court filings in this case, the Court will deny Defendants' Motion for Summary Judgment on Counts I, II, and III, and withhold a decision on Counts V and VI until they are ripe for adjudication.

## II.    BACKGROUND

### A.    <u>Parties</u>

Plaintiffs are Thomas J. Timoney ("Timoney"), Esquire, court-appointed receiver for the Hankin Family Partnership ("Hankin"),[4] and Realen Valley Forge Greenes Associates, legal and equitable owners of 135 acres of land — known as the Valley Forge Golf Course ("Property") — in Upper Merion Township.[5]  Defendants are Upper Merion Township ("Township"), the Upper Merion Township Board of Supervisors ("Board" or "Board of Supervisors"), and the Upper

---

[3] The Court has considered the following documents in deciding the Motion for Summary Judgment:  Defendants' Motion for Summary Judgment, Statement of Uncontested Facts, Revised Statement of Uncontested Facts and supporting Exhibits (Doc. Nos. 141, 142, 146, 149), Plaintiff Timoney's Memorandum in Opposition to the Motion for Summary Judgment, Statement of Facts in Opposition to Defendants' Statement of Facts, Response in Opposition to Statement of Undisputed Facts and supporting Exhibits (Doc. Nos. 164, 165, 166, 167-171), Defendants' Reply, Statement of Facts in Opposition to Plaintiff's Statement of Facts and supporting Exhibits (Doc. Nos. 178, 179, 180), and Plaintiff's Surreply (Doc. No. 182).

[4] In the original Complaint filed on April 3, 2001 (Doc. No. 1), the Hankin Family Partnership was named as Plaintiff.  On May 17, 2001, an Amended Complaint was filed in which the Hankin Family Partnership was terminated as plaintiff and replaced by the Receiver for the Hankin Family Partnership, Thomas J. Timoney, Esquire.  As noted, in January 2011, Mr. Timoney passed away.  The Montgomery County Court of Common Pleas appointed Herman J. Weinrich, Esquire, as his replacement.

[5] On June 24, 2004, Hankin, the legal owner of the Property when this federal suit began, sold the Property to Realen, the former equitable owner.

2

Merion Township ZHB.[6]  The Court will refer to Defendants collectively throughout this

Opinion as "Defendants."

**B.  The Property**

The Property at issue in this case is 135 acres of land located in the King of Prussia

region of Montgomery County, Pennsylvania, which includes Upper Merion Township.  The

Property is bounded by North Gulph Road, North Warner Road, Guthrie Road, Swedesford Road

and the Route 422 Expressway.  (Doc. No. 7 ¶ 13.)  It has been zoned for "agricultural use" since

1953, and is surrounded by other properties that are zoned and used for commercial purposes.

In 1953, the Township created an agricultural zoning district which designated for

agricultural use a substantial portion of land in Upper Merion Township, including the Property.

In re Realen Valley Forge Greenes Associates, 838 A.2d 718, 721 (Pa. 2003) (citing Zoning

Ordinance § 165-10(A)-(D)).  In 1959, the Township declared in a comprehensive plan that

preferred use of the Property is for "parks, recreation and open space."  Timoney v. Upper

Merion Township, No. 01-1622, 2004 WL 2823227, at *1 (E.D. Pa. Dec. 8, 2004).  In 1964, the

Board of Supervisors enacted Ordinance 64-141, which created an "overlay zone"[7] on the

_____

[6]  The ZHB is an administrative body created by the Pennsylvania Municipalities
Planning Code ("MPC") with limited, exclusive jurisdiction to adjudicate various zoning
matters. 53 P.S. § 10901 et seq.  The ZHB has jurisdiction to hear validity challenges to an
Upper Merion Township Zoning Ordinance pursuant to sections 909.1 and 916.1(a) of the MPC.
Members of the ZHB are appointed by the Upper Merion Board of Supervisors.  ZHB members
who presided over Realen's validity challenge were Chairman Salvatore F. Bello, Jr., Vice
Chairman Edward McBride, and Secretary William C. Whitmore.  (Doc. No. 149, Ex. D.)  When
a party seeks rezoning, a request may be made to the Board of Supervisors.  A validity challenge
also may be filed with the ZHB.

[7]  An overlay zone is a regulatory tool that creates a special zoning district, placed over an
existing base zone, and has special provisions in addition to those in the underlying base zone.
The overlay district can either share common boundaries with the base zone or can cut across

Property to maintain its use as "open space." (Doc. No. 179 ¶ 25.) In 1965, the Montgomery County Court of Common Pleas declared that the Ordinance was "null and void." <u>Valley Forge Golf Club v. Upper Merion Township</u>, 39 Pa. D. & C.2d 181, 189 (C.P. Montgomery County 1965). Despite the nullity of the Ordinance, the Property remained zoned for agricultural use only.

### C.   <u>Attempts to Rezone the Property</u>

From 1955 to 1985, the Board of Supervisors granted rezoning requests to surrounding properties that were within the original agricultural zoning district. The Board, however, refused similar requests for the Property. <u>Hankin Family P'ship v. Upper Merion Township</u>, No. 01-1622, 2002 WL 461794, at *2 (E.D. Pa. Mar. 22, 2002). In 1967, the Board of Supervisors denied Hankin's first rezoning request. (Doc. No. 7 ¶ 30.)

In 1967 and 1968, the Board of Supervisors attempted to acquire the Property through condemnation, with the Township applying for state and federal funds to do so. In 1967, the Board was told by federal and state officials that it needed to reevaluate the proposed condemnation price for the Property because the offer appeared to undervalue the Property significantly. (Doc. No. 167, App. 150-51, 167.) In 1968, the Board enacted Ordinance 66-189 in its attempt to use eminent domain to take the Property. The Ordinance was challenged and eventually invalidated by a state court. (Doc. No. 167, App. 134-35.)

The Board of Supervisors continued the attempt to control use of the Property by denying further requests by Hankin for rezoning. The perspective of the Board in denying requests to

---

base zone boundaries. Regulations or incentives usually are attached to the overlay district to protect a specific resource or guide development within a certain area.

rezone the Property is evident from a pamphlet distributed by the Township to its residents in connection with a November 1965 ballot question proposing acquisition of the Property.  In re Realen Valley Forge Greenes Associates, 838 A.2d 718, 723 (Pa. 2003).  The pamphlet provides as follows:

> The acquisition of the Golf Course [located on the Property] will, by no means, benefit only those who play golf, but is a vital necessity as far as maintaining green areas before the last of our good, green areas is gobbled up.  In addition, it is for the welfare of the human being to enjoy natural green areas in view of the ever-increasing jungle of cement and steel all about us.
>  . . .
>
> A privately-owned golf club, the course consists of 135 acres of rolling, green property including several buildings. . . . It is the last major open space, green area-not designated for any type of residential or commercial development-remaining in the 17-square mile township. The township supervisors and local planning commission never have considered the tract for development. The township comprehensive plan, a complete program for orderly community development lists the area as open, green space. Development of the land for other purposes would create a serious imbalance in the township.
> . . .
>
> The importance of preserving the golf course as open space has been considered officially by the Township since 1959.  The first legal action was initiated in July 1964, when the supervisors placed an "overlay" on the course. This legal move was to "freeze" the value of the property so additional improvements after that date could not be charged to township taxpayers in acquiring the tract. It also served as "fair warning" to the owners-present and future-that the supervisors intended to act to acquire the property for public ownership. . . .
>
> The supervisors want to preserve the area as open, green space to prevent unwarranted development which would adversely affect the township. . . .
>
> If the township cannot acquire the course, zoning changes could be sought to permit apartment complexes, industrial construction or possibly a race track. This would result in monumental traffic congestion on our already overburdened local and State highways.

Id. at 723-24.

As reported in the *Times Herald* and *Today's Post*, the Township's planning officials

publicly met in 1981 to discuss a strategy to thwart any development plan for the Property.  (Doc. No. 167, App. 196-98.)  Attendees were concerned with the type of zoning designation that would be easiest to defend against potential challenges.  (Id.)  When the Chair of the Montgomery County Planning Commission, Anthony Paolini, suggested changing the zoning from agricultural to recreation, Supervisor Joan Kellett publicly admitted, "Let's face it.  This (discussion) is all subterfuge.  We want a golf course."  (Doc. No. 164 at 15; Doc. No. 167, App. 196.)

**D.      1998-1999 Validity Challenge Before the Zoning Hearing Board**

On June 19, 1996, Timoney entered into an agreement to sell the Property to Realen.  The 1996 Purchase Agreement (Doc. No. 149, Ex. C) required Realen to obtain the right to develop the Property for commercial purposes, either through rezoning or through a successful challenge to the validity of the Township's agricultural zoning designation, and to appeal any adverse decision to the Court of Common Pleas of Montgomery County.  (Doc. No. 7 ¶ 46.)  After entering into the Purchase Agreement, Realen informally investigated the possibility of petitioning the Board of Supervisors to change the zoning designation.  (Id. ¶ 47.)  The Supervisors told Realen that, in order to obtain rezoning of the Property, it would have to acquire support of the local community groups that had opposed development of the Property in the past. (Id. ¶ 48.)  Realen could not get community support and determined that pursuing rezoning would be fruitless.  (Id.)

In October of 1997, the Board of Supervisors offered to purchase the Property for $4,800,000, which was based on the fair market value of the Property zoned for agricultural use as determined by the Montgomery County Board of Assessment.  (Doc. No. 7 ¶ 50.)

6

Comparatively, all of the privately-owned properties immediately adjacent to the Property were at the time zoned for commercial use with a fair market value ranging from approximately 3 to 22 times per acre more than the Property's value.  (Id. ¶ 52.)

After realizing that pursuing rezoning would be futile, and after not accepting the offer from the Board of Supervisors to purchase the Property at a depressed price, Realen had only one other option under the Purchase Agreement — to bring a validity challenge before the ZHB to the agricultural zoning designation.  Accordingly, Realen filed on November 13, 1997 with the ZHB a validity challenge to the Upper Merion Township Zoning Ordinance (the "Realen Validity Challenge").  (Doc. No. 149, Ex. E.)

From February 1998 to June 1999, the ZHB conducted 14 hearings on the validity challenge (the "Hearings").[8]  During the Hearings, both Realen and the Board presented evidence recounting the history of the Property, previous rezoning challenges, and Realen's proposed uses. (See Doc. No. 149, Ex. D.)  In addition, Realen presented evidence that other similarly situated properties surrounding the Property had been rezoned by the Board of Supervisors for commercial use.  Realen asserted that a denial of the request to rezone the Property would (1) violate due process; (2) be arbitrary and irrational; (3) constitute special legislation; and (4) constitute unlawful spot zoning.  (Doc. No. 149, Ex. D.)

---

[8]  According to the August 13, 1999 Opinion and Order of the Zoning Hearing Board, the 14 public hearings were held on February 4, 1998, March 18, 1998, April 15, 1998, June 6, 1998, June 23, 1998, July 15, 1998, October 24, 1998, November 18, 1998, January 6, 1999, February 17, 1999, March 17, 1999, April 7, 1999, and June 15, 1999.  (Doc. No. 149, Ex. D.)  Although the August 13, 1999 Opinion and Order lists the first of the two June 1998 hearings as occurring on June 6, 1998, transcripts from the Hearings indicate the date to be June 9, 1998.  (Doc. No. 170, App. 1100.)

1.     <u>Prior Rezoning Challenge</u>

In the 1980s, Hankin sold the Property to Acorn Development Corporation ("Acorn").

(Doc. No. 164 at 7.)  A condition of the sale required that the Property be rezoned by the Board

of Supervisors.  (<u>Id.</u>)  In 1984, Acorn challenged before the ZHB the Board's denial of a request

to rezone (the "1984 Acorn Challenge").  During a hearing on the 1984 Acorn Challenge, the

Township's own expert, John Rahenkamp, criticized the Township for not allowing development

of the Property.  Rahenkamp opined that the Property was underutilized, stating that it was "in

the public interest to optimize the intensity of the site."  (Doc. No. 168 at 326.)  He explained

that he could not excuse "the [T]ownship from responsibility for not moving forward on the

critical planning to begin dealing with the realities of this intense core area."  (Doc. No. 168 at

327.)

During the litigation of the Acorn Challenge, some members of the Board of Supervisors,

including Supervisor Ralph Volpe, engaged in conversations with representatives of Acorn to

discuss possible settlement and rezoning.[9]  (<u>See</u> Doc. No. 170, App. 923-24.)  Members of the

Upper Merion Concerned Citizens Committee viewed these discussions to be in "complete

disregard for the legal procedures and requirements as covered in the State's Municipalities

Planning Code and in the Township's own Zoning Ordinance."  (Doc. No. 170, App. 923-24;

Doc. No. 167, App. 285-86.)  Orville Enders, President of the Upper Merion Concerned Citizens

Committee, wrote to Volpe to express the Committee's concern that these negotiations were

happening without the input of the Township and "when the Concerned Citizens Committee is

_____

[9]  According to Volpe, these conversations occurred with Acorn representatives during
the Acorn Challenge.  (Doc. No. 170, App. 924.)

working hard to help defend the Township against Acorn's Challenge." (Doc. No. 167, App. 286.) According to Volpe, he intended to have negotiations first with Acorn before holding a public meeting about possible development of the Property. (Id., App. 925-26.)

In these conversations, Volpe made a series of proposed conditions that could be met by Acorn to resolve the litigation. (Doc. No. 170, App. 924.) Specifically, Volpe stated:

> [T]hose conditions were, one, basically that they rebuild an 18-hole golf course on the 130 some plus acres, that golf course had to be 6,000 yards in length, that the golf course then be deeded over to the [T]ownship, that the applicant then pay the [T]ownship the fee that would be a normal customary fee for renting an 18-hole golf course, and that they would operate it and maintain the golf course open to the public and then we could possibly talk about resolving the remaining acreage that would remain after they came up with that 18-hole golf course. That was based on the premise that one of the things they were going to be building there was a hotel, which would then obviously - - a lot of the amenities that you would normally have for a golf course would be incorporated into the hotel. So my guess was that it was going to be maybe 70 to 80 acres necessary [for the 6,000-yard golf course] and then obviously maybe 60 to 70 acres that they could develop. That's what I was basically proposing and which subsequently we had a public meeting on.

(Doc. No. 170, App. 924-25.) Given that the golf course was approximately 5,200 yards in length, Acorn could not meet the conditions. (Id., App. 925-26.) Consequently, all side-discussions about possible rezoning ended. (Id.) Two weeks later, Acorn notified Volpe that circumstances had changed and they in fact could meet the 6,000-yard requirement. (Id.) By then, however, Volpe said it was too late to reopen negotiations on the issue. (Id.) No studies were conducted regarding the viability of a 5,200-yard golf course compared to a 6,000-yard golf course. (Doc. No. 170, App. 929.) When asked where the condition of 6,000 yards came from, Volpe stated that it was "an arbitrary figure I came up with . . . ." (Doc. No. 170, App. 969-70.)[10]

---

[10] Volpe testified at his deposition in this case that he had settlement discussions with Realen which included similar arbitrary yardage requirements for a golf course on the Property. (Doc. No. 170, App. 924.)

Because the conditions could not be met, on September 5, 1985 the ZHB issued an opinion and order denying the Acorn validity challenge.

      2.    <u>Similarly Situated Properties</u>

At the 1998-1999 Hearings, both parties called experts to testify on whether properties surrounding the Property were similarly situated.  At the June 9, 1998 hearing, the Honorable David Craig, a former Judge of the Pennsylvania Commonwealth Court and a land use expert, testified that the Property was being treated differently from the surrounding properties.  (Doc. No. 170, App. 1117-18.)  He testified that none of the four uses permitted by right in an agricultural zoning district were viable uses of the Property.  (Doc. No. 170, App. 1118-30.) Similarly, John VanLuvanee, another expert witness, testified that the Property was being treated differently without justification.  (Doc. No. 169, App. 813-30.)  This sentiment was also held by Dennis Glackin, an expert witness who testified at the March 18, 1998 hearing that there is "no question" that the Property was treated differently from the surrounding properties.  (Doc. No. 170, App. 1068-69.)

The Board of Supervisors presented evidence that the Property was unique.  (Doc. No. 149, Ex. D ¶¶ 40, 45-46.)  The Property is significantly larger than surrounding properties and is completely surrounded by roadways.  (<u>Id.</u> ¶¶ 41-42, 49, 52, 56, 59, 61.)  However, also before the ZHB was evidence that there was nothing unique about the Property which would prevent the development of single family residences on the site.  (<u>Id.</u> ¶¶ 68-84.)

      3.    <u>Evidence of Unjustifiable Conduct and Self-Dealing</u>

Two members of the Board of Supervisors attended the ZHB hearings on Realen's validity challenge: Chairman Robert Clifton and Member Ralph Volpe.  When the first hearing

began on February 4, 1998, Supervisor Volpe sat on the presiding adjudicatory bench, alongside the three members of the ZHB.  At the beginning of the hearing, Volpe noted that he was the liaison for the Board of Supervisors and stated that "since the Township will be a party, it might be appropriate if I step down from the stage and sit in the audience."  (Doc. No. 170, App. 1052-53.)  As explained by Volpe during his November 15, 2010 deposition, as liaison to the ZHB from the Board of Supervisors, he always attended the meetings, and while it can be inferred that he usually sat with the ZHB, he "sat down in the audience whenever Realen was the discussion." (Doc. No. 170, App. 979.)

At the March 17, 1999 hearing, Chairman Robert Clifton gave testimony in his capacity as Chairman and as a concerned citizen.  He noted that "[the Board of Supervisors and I] think [the Property] should continue [as a golf course]."  (Doc. No. 170 at 1203.)  This statement was made after the Township's own expert, John Rahenkamp, testified at an earlier hearing that he believed the Township could not require the Hankin Property to be kept as open space through zoning.  (Doc. No. 170, App. 1157.)

Anthony "Chuck" Volpi was a member of the Board of Supervisors from 1963 to 1969 and from 1995 until 2007.  (Doc. No. 165 ¶ 16.)  Supervisor Volpi was a developer and builder who owned land in Upper Merion Township.  He was involved in the construction of a Sheraton Hotel, which is situated near the subject Property in Upper Merion Township.  He built the hotel for a competitor of the Hankins, Leon Altemose.  (Doc. No. 165 ¶ 94).  Supervisor Volpi and his business partner Blain Scott, a former member of the Board of Supervisors, also developed and built the Continental Arms Apartments.  This project was built on land which, like the Property, was originally zoned for agricultural use, but which, unlike the Property, had been rezoned.

11

(Doc. No. 170, App. 999-1015, 1028.)

In 1964, Supervisor Scott wrote a memo to other members of the Board of Supervisors stating, "we should discourage any real estate speculator, agent or developer who contacts us concerning the possibility of rezoning [the Property].  Further consideration should be given to placing an overlay on this property *even though the legality of same is doubtful*."  (Doc. No. 167, App. 69 (emphasis added).)

During his deposition in this case, Supervisor Ralph Volpe admitted that other Board members improperly used an opinion of a Common Pleas Court Judge to justify denying of rezoning requests.  Supervisor Volpe noted that "[i]t's my understanding that some of [the Board members], even though they may not have had the legal background, they decided they were going to interpret Judge Honeyman's position as saying, hey, you can control it by zoning."[11] (Doc. No. 170, App. 928.)  Supervisor Volpe also noted that he did not "think that would be a legal thing that you could do."  (Doc. No. 170. App. 974.)

### 4.   Reasons for Denying the Request to Rezone

At one of the ZHB Hearings, Defendant Upper Merion Township presented the expert testimony of Jeffrey Greene.  He did a traffic study of two plans offered by Realen for development of the Property: Plan A and Plan B.[12]  Mr. Greene concluded that both Plans A and

---

[11] Judge Honeyman was a Judge on the Court of Common Pleas of Montgomery County. He presided over the challenge by Hankin to the Declaration of Taking by the Upper Merion Valley Forge Municipal Authority.  In 1970, the Court of Common Pleas of Montgomery County set aside the taking declaration.  (Doc. No. 167, App. 178-87.)

[12] Plan A proposed use of the Property for multi-family residences and hotel, retail and other commercial use (all designed to comply with regulations applicable in a C-2 Commercial District zoning designation).  Plan B proposed uses such as office, hotel, retail, and other commercial use.  See In re Realen Valley Forge Greenes Associates, 838 A.2d 718, 726 (Pa.

B would result in a measurable negative impact on the amount of traffic in and around the subject property. (Doc. No. 149, Ex. F ¶¶ 105-11.) In opposing the instant Motion for Summary Judgment, Plaintiff Timoney has presented evidence that the use over the years of traffic congestion as a justification to prevent development of the Property was pretextual.[13]

### 5.    Zoning Hearing Board Decision

On August 13, 1999, after holding 14 hearings from February 1998 through June 1999, the ZHB denied Realen's validity challenge. (Doc. No. 149, Ex. D.) The ZHB concluded that the Property's agricultural zoning permitted numerous uses other than as a golf course or open space, and there was sufficient evidence to distinguish the Property from other surrounding properties. The ZHB held that the zoning was "not 'spot zoning,' arbitrary or irrational, nor enacting special legislation." (Doc. No. 149, Ex. D at 49.) In reaching its August 13, 1999 decision, the ZHB referred to its September 5, 1985 decision denying the 1984 Acorn Challenge. (Doc. No. 164 at 11.) In particular, the ZHB noted that the 1984 Acorn Challenge was nearly identical to the 1997 Realen Challenge. (Doc. No. 168, App. 484-534.) The ZHB therefore incorporated many findings of fact from the Acorn Challenge decision into its August 13, 1999

---

2003). The major difference between Plan A and Plan B is that Plan A includes a residential component whereas Plan B omits the residential use in favor of office development. (Doc. No. 149, Ex. F ¶¶ 44-45.)

[13] Although the ZHB accepted Greene's testimony that rezoning the Property would cause congestion (Doc. No. 149, Ex. D ¶¶ 88-90), there is evidence that this reason may have been pretextual. Following a Pennsylvania Supreme Court decision in 2003 in which the Court held that the zoning of the Property constituted impermissible "spot zoning," the Township approved Realen's proposed Plan C, which contained a mixed-use of residential, commercial, office, and hotel. Before the Township approved Plan C, its own experts found that Plan C would result in at least three to four times more traffic than Plan A or Plan B. (Doc. No. 168, App. 606-11.)

decision denying Realen's validity challenge.

E.     **State Proceedings**

Realen appealed the ZHB findings to state court.  On April 12, 2001, the Court of

Common Pleas of Montgomery County affirmed the ZHB decision.  In re Realen Valley Forge

Greenes Assocs., 59 Pa. D. & C.4th 429 (C.P. Montgomery County 2001); (Doc. No. 149, Ex. I.)

On June 4, 2002, the Commonwealth Court of Pennsylvania affirmed the order of the Court of

Common Pleas.  In re Realen Valley Forge Greenes Assocs., 799 A.2d 938 (Pa. Commw. Ct.

2002); (Doc. No. 149, Ex. J).  An appeal was then taken to the Supreme Court of Pennsylvania.

In 2003, the Pennsylvania Supreme Court reversed the August 13, 1999 decision of the

ZHB, holding that the Township through the Board of Supervisors engaged in "reverse spot

zoning."  In re Realen Valley Forge Greenes Assocs., 838 A.2d 718, 721 (Pa. 2003).

Specifically, the Pennsylvania Supreme Court held:

> [T]his agricultural zoning, designed to prevent development of the subject property
> and to 'freeze' its substantially undeveloped state for over four decades in order to
> serve the public interest as 'green space', constitutes unlawful 'reverse spot zoning'
> beyond the municipality's proper powers.

Id.  The Pennsylvania Supreme Court noted that its scope of review was limited to "determining

whether the [Zoning Hearing] Board abused its discretion, committed an error of law, or made

findings of fact not supported by substantial evidence."  Id. at 727.  Further, the court stated that:

> It turns reason and land planning precepts on their head to assert, as the
> zoning board's decision implies, that this tract's restricted, agricultural
> zoning is justified by its ready access to the region's primary arterial roads on
> every hand. . . . [N]either the zoning board nor the courts below have offered
> either reason or authority to support the proposition . . . that the location of
> these highways makes agricultural zoning appropriate for this tract while the
> properties on the opposite side of the same roadways are appropriately zoned
> and developed for intense, commercial use.

14

Id. at 730.

Prior to this decision, on March 30, 2001, Plaintiff Hankin filed an inverse condemnation action against Defendants in the Montgomery County Court of Common Pleas (the "Inverse Condemnation Action").   Hankin Family Partnership v. Upper Merion Township, No. 01-1622, 2002 WL 461794, at *3 (E.D. Pa. Mar. 22, 2002).  Hankin sought compensation under 26 Pa. Cons. Stat. § 502(c)(3) for a de facto taking of the Property.  Id.  Defendants filed preliminary objections to the lawsuit.  On November 27, 2001, the Court denied the objections.  On December 17, 2004, the Court of Common Pleas entered an order staying the inverse condemnation action pending settlement negotiations.  (Doc. No. 120 at 5.)  This stay has never been lifted.[14]

---

[14]   There have been two additional state court proceedings involving the parties to the instant lawsuit: a declaratory judgment action and a rescission action, which are discussed below.

On March 18, 2005, Realen filed an action in Montgomery County Court of Common Pleas, seeking a declaration that Realen was not required to pay an additional purchase price to Receiver Timoney and that Realen had authority to unilaterally dismiss Timoney's claims against Defendants in the instant federal action (the "Declaratory Judgment Action").  (See Doc. No. 115, Ex. A ¶ 44; Doc. No. 120 at 6.)  The court held that Timoney was not entitled to any compensation above the $27 million received at closing.  The court further held that Realen did not have the right to dismiss this federal civil rights action without Timoney's consent.  (Doc. No. 120, App. Tab 11 at 24.)  Timoney appealed the ruling denying the additional purchase price. Realen in turn appealed the holding that it was not entitled to unilaterally dismiss the instant federal litigation.  The Superior Court of Pennsylvania affirmed both decisions of the Court of Common Pleas.  On April 27, 2011, both Timoney and Realen filed petitions for allowance of appeal to the Pennsylvania Supreme Court.  On September 20, 2011, the Pennsylvania Supreme Court denied these petitions.

In addition, on May 14, 2007, Receiver Timoney filed an action in the Montgomery County Court of Common Pleas seeking to rescind the 2003 Purchase Agreement and the 2001 Joint Prosecution Agreement he made with Realen (the "Rescission Action").  (Doc. No. 120, App. Tab 5.)  This 2003 Purchase Agreement gave Realen legal ownership of the property and the 2001 Joint Prosecution Agreement between Timoney and Realen allowed the Kaplin law firm to bring on their behalf the instant suit in federal court and other suits in state court.  (Doc. No.

15

F.    **Federal Proceedings**

On April 3, 2001, while the denial of the validity challenge was being appealed in

Pennsylvania state court, Hankin and Realen filed a Complaint against Defendants in this Court.

(Doc. No. 1.)  The case was assigned to then Chief Judge James Giles.[15]  On May 17, 2001,

Hankin was terminated as Plaintiff and replaced by Receiver Timoney.  On the same day,

Timoney and Realen ("Plaintiffs") filed the Amended Complaint.  (Doc. No. 7.)  The Amended

Complaint contains six Counts naming all Defendants in each Count and asserts violations of 42

U.S.C. § 1983.  They are:  Count I - violation of equal protection; Counts II and III - violation of

substantive due process;[16] Count IV - violation of procedural due process; and Counts V and IV -

---

120, App. Tab 1.)  On January 28, 2008, the state court dismissed all claims with prejudice,
except for the breach of contract claim.  (Doc. No. 120, App. Tab 8.)  The court stayed the breach
of contract claim pending a decision in the Declaratory Judgment Action.  (Doc. No. 120 at 7;
Id., App. Tab 8.)  On February 9, 2010, after resolution of the Declaratory Judgment Action, the
court dismissed the breach of contract claim.  (Doc. No. 120, App. Tab 12.)  Timoney appealed
this ruling to the Superior Court of Pennsylvania.  On January 20, 2011, the dismissal was
affirmed.  On February 22, 2011, Plaintiff Timoney filed a petition for allowance of an appeal to
the Supreme Court of Pennsylvania.  On September 20, 2011, the Pennsylvania Supreme Court
denied this petition.

[15]  On September 25, 2008, in anticipation of Judge Giles's retirement, the matter was
reassigned to Judge Petrese B. Tucker.  On October 17, 2008, the case was reassigned from
Judge Tucker to this Court.

[16]  Count II refers to the decisions of the Board of Supervisors of Upper Merion Township
and the ZHB restricting development of the Property through agricultural zoning in order to
depress its fair market value so that Upper Merion Township could acquire the Property at a
lower cost.  Count III refers to the use of agricultural zoning of the Property by Upper Merion
Township to prevent future development and to preserve it as a golf course or open space.  Count
III also refers to the decisions of the ZHB rejecting the Acorn and Realen validity challenges in
order to further the policy of the Township to prevent development of the Property.  (See Doc.
No. 7 ¶¶ 68-81.)

taking without just compensation.[17]  (Doc. No. 7 ¶¶ 61-97.)

1.      Defendants' Motion to Dismiss

On June 8, 2001, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6).  (Doc. No. 10.)  On March 22, 2002, Judge Giles granted the Motion to

dismiss Count IV (procedural due process), and denied the Motion on all other counts.  The

remaining counts were placed on the suspense docket pending the completion of the ongoing

state court spot zoning litigation.[18]  Hankin Family Partnership v. Upper Merion Township, No.

01-1622, 2002 WL 461794, at *6 (E.D. Pa. Mar. 22, 2002).  On January 14, 2004, Chief Judge

Giles held a status hearing.  The matter was reopened on February 10, 2004.  On March 11, 2004,

Township Defendants filed an Answer to the Amended Complaint.  (Doc. No. 35.)

2.      Plaintiffs' Motion for Partial Summary Judgment

On July 6, 2004, Plaintiffs filed a Motion for Partial Summary Judgment.  (Doc. No. 40.)

Plaintiffs asserted that the decision of the Pennsylvania Supreme Court finding impermissible

reverse spot zoning formed a basis for the court in this case to grant summary relief on the equal

protection claim based on the doctrine of collateral estoppel.  On December 8, 2004, Judge Giles

---

[17]  Count V refers to the action of Defendants in continually rejecting development of the
Property to preserve it as a golf course.  Count VI refers to the action of Defendants to control the
development of the Property through zoning, also to preserve it as a golf course.  (See Doc. No. 7
¶¶ 91-97.)

[18]  Plaintiffs appealed to the Court of Appeals for the Third Circuit the order placing the
remaining counts on the suspense docket.  The Court of Appeals vacated the order in part and
remanded for Judge Giles to determine whether the case presented exceptional circumstances
justifying the stay pursuant to the Colorado River abstention doctrine.  See Colorado River Water
Conservation Dist. v. United States, 424 U.S. 800 (1976).  Before Judge Giles made a decision,
the parties agreed to leave the case on the suspense docket while the Pennsylvania Supreme
Court considered the spot zoning issue.

denied the Motion, holding that Plaintiffs failed to establish all elements of collateral estoppel under Pennsylvania common law.  Timoney v. Upper Merion Township, No. 01-1622, 2004 WL 2823227, at *5-6 (E.D. Pa. Dec. 8, 2004).  Judge Giles noted that the Pennsylvania Supreme Court limited its analysis on appeal to "whether the [ZHB] abused its discretion or committed legal error."  In re Realen Valley Forge Greenes Associates, 838 A.2d at 727.  "[I]t did not purport to put itself in the role of fact-finder . . ."  Timoney, 2004 WL 2823227, at *7.

On August 22, 2008, Judge Giles placed the case back on the suspense docket and ordered the parties to inform the Court of any related state court decisions.  (Doc. No. 87.)  On January 11, 2010, this Court ordered the parties to show cause why the instant case should not be removed from the suspense docket and placed on the trial docket.  (Doc. No. 90.)  On February 12, 2010, the order to show cause was vacated, pending the outcome of ongoing state cases, and the matter remained in suspense.  (Doc. No. 92.)  On February 26, 2010, Plaintiff Timoney filed a Motion to reconsider and vacate the February 12, 2010 Order, seeking to remove the matter from the suspense docket.  (Doc. No. 93.)  This Court held a hearing on March 24, 2010.  The next day, the Court granted Plaintiff Timoney's Motion and placed the case back on the trial docket.  (Doc. No. 99.)

### 3.   Defendants' Motion for Summary Judgment

On September 28, 2010, Defendants filed the instant Motion for Summary Judgment. (Doc. No. 141.)  Defendants argue that the statute of limitations prevents the Court from considering evidence of acts which occurred prior to August 13, 1999, the date the ZHB denied Realen's validity challenge.  Without pre-August 13, 1999 evidence, Defendants submit that Plaintiffs are unable to establish any violation of § 1983 and, consequently, the Court should

18

grant summary judgment in their favor.  On February 11, 2011, Plaintiffs filed a Memorandum of

Law in Opposition to Defendants' Motion for Summary Judgment asserting that the Court may

consider pre-August 13, 1999 evidence, and that the evidence reveals genuine issues of material

fact which prevent the Court from granting summary judgment in favor of Defendants.  (Doc.

No. 164.)  Having been fully briefed by the parties, the Motion is now ripe for a decision.

## III.    LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine issue as to any material fact

[such] that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

"Once the moving party has shown that there is an absence of evidence to support the claims of

the non-moving party, the non-moving party may not simply sit back and rest on the allegations

in its complaint."  Smith v. City of Bethlehem, No. 06-5290, 2009 WL 564620, at *1 (E.D. Pa.

Mar. 5, 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Instead, he must "go

beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, and designate specific facts showing that there is a genuine issue for

trial."  Id. (internal quotations omitted).

The United States Supreme Court has stated, "the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A genuine issue of material fact arises only if

a reasonable jury could find for the nonmoving party on that fact.  Id. at 248.  A factual dispute is

*material* only if it might affect the outcome of the suit under governing law.  Kaucher v. County

of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson, 477 U.S. at 248) (emphasis added).

"If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 250-51 (citations omitted).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Id. at 247-49.

## IV. DISCUSSION[19]

### A.   Statute of Limitations

Defendants argue that the statute of limitations applicable to the claims at issue in this case prevent the Court from considering any evidence of misconduct that occurred prior to the August 13, 1999 decision of Defendant Zoning Hearing Board.  In response, Plaintiffs argue that although the statute of limitations bars the assertion of claims that arise from conduct occurring prior to August 13, 1999, it does not bar the admission of evidence of acts which occurred prior to this date.  The Court agrees with Plaintiffs.  The statute of limitations does not prevent the Court from considering evidence of acts which occurred prior to August 13, 1999 in determining if there is a genuine issue of material fact.

Consistent with the March 22, 2002 Opinion of Judge Giles (Doc. No. 17), the statute of

---

[19]  For purposes of determining civil rights liability, a subunit of a local government is identical to the local government itself.  See D'Altilio v. Dover Township, No. 06-1931, 2007 WL 2845073, at *3 (M.D. Pa. Sept. 26, 2007) (citing Martin v. Red Lion Police Department, 146 Fed. App'x 558, 562 n.3 (3d Cir. 2005) (holding that a suit against a municipal police department is the same as a suit against the municipality itself); Satterfield v. Borough of Schuylkill Haven, 12 F. Supp. 2d 423, 431 (E.D. Pa. 1998) (a suit against the borough council is the same as a suit against the borough itself)).  The Board of Supervisors is the subunit through which Upper Merion Township enacts, among other things, zoning ordinances.  Because the Board of Supervisors is a subunit of Upper Merion Township, a finding of liability against the Board of Supervisors is the same as a finding of liability against the Township.

limitations began to run on August 13, 1999 and expired on August 12, 2001.[20]  The original

Complaint was filed on April 3, 2001, before the expiration of the statute of limitations and

therefore was timely filed.  While the statute of limitations applies to bar the assertion of claims

arising from acts which occurred before August 13, 1999, it does not apply to bar the admission

of evidence regarding acts which occurred prior to this date.

       In Black Law Enforcement Officers Ass'n v. City of Akron, 824 F.2d 475, 483 (6th Cir.

1987), the Sixth Circuit reversed the trial court's decision granting a motion *in limine* to preclude

plaintiffs from presenting evidence of allegedly discriminatory practices that occurred outside of

the statute of limitations for a § 1981 and a § 1983 claim.  The court held that "[t]he statute of

limitations is a defense . . . , not a rule of evidence.  Therefore, . . . [it] has no bearing on the

---

[20]  In the March 22, 2002 Opinion (Doc. No. 17), Judge Giles held that "any equal
protection or substantive due process claims arising from the August 13, 1999 Zoning Board
decision are timely, but claims based on earlier actions of the defendants are time-barred."
Hankin Family Partnership v. Upper Merion Township, No. 01-1622, 2002 WL 461794, at *6
(E.D. Pa. Mar. 22, 2002).  Judge Giles further held that the Court "would only recognize
damages arising from the August 13, 1999 denial of Realen's challenge to the validity of the
continued [agricultural] zoning classification of the Hankin Property."  Id.  Accordingly,
consistent with this decision, the statute of limitations began to run on August 13, 1999 — the
date upon which the right to institute this cause of action arose, see Sevast v. Kakouras, 915 A.2d
1147, 1153 (Pa. 2007) ("Generally speaking, the statute of limitations begins to run as soon as
the right to institute and maintain the suit arises.") — and expired on August 12, 2001.  See
Knoll v. Springfield Township School District, 763 F.2d 584, 585 (3d Cir. 1985) (statute of
limitations for a civil rights cause of action under 42 U.S.C. § 1983 is two years).

       In the March 22, 2002 Opinion, Judge Giles *sua sponte* stayed the case pursuant to the
abstention doctrine of Colorado River Water Conservation Dist. v. United States, 424 U.S. 800
(1976).  As previously noted, Plaintiffs appealed this decision.  On May 27, 2003, the Court of
Appeals for the Third Circuit vacated the decision to stay the case.  See Timoney v. Upper
Merion Township, 66 F. App'x 403, 404-06, Nos. 02-2096, 02-2228, 2003 WL 21213332 (3d
Cir. May 27, 2003).  The remainder of Judge Giles' Opinion, including the holding regarding
timeliness of the Complaint, was not vacated and remains intact.

admissibility of evidence." Id. (quoting United States v. Ashdown, 509 F.2d 793, 798 (5th Cir.), cert. denied, 423 U.S. 829 (1975)) (second alteration in original). See also Vereen v. Woodland Hills School District, No. 06-462, 2008 WL 794451, at *23 (W.D. Pa. Mar. 24, 2008) ("[T]he statute of limitations does not operate to limit the evidence [plaintiff] may introduce regarding her co-workers.") (alteration in original). Similarly, the Second Circuit has noted: "A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period." Fitzgerald v. Henderson, 251 F.3d 345, 365 (2d Cir. 2001). Thus, in deciding the instant Motion, the Court may consider evidence of acts prior to August 13, 1999 relevant to claims properly asserted within the limitations period.

**B.     Count I: Equal Protection Violation**

Count I of the First Amended Complaint is brought pursuant to 42 U.S.C. § 1983 and alleges a violation of the constitutional right to equal protection. Plaintiffs assert this claim based on a "class of one" theory. To establish a 42 U.S.C. § 1983 equal protection violation under a "class of one" theory, Plaintiff must establish that (1) Defendants treated Plaintiff differently from other, similarly situated property owners, (2) Defendants did so intentionally, and (3) there was no reasonable basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006). Here, genuine issues of material fact exist regarding whether Plaintiffs were treated differently from other similarly situated property owners, whether the different treatment was intentional, and whether there was a reasonable basis for the difference in treatment. Consequently, the Motion for Summary Judgment on Count I will be denied.

1.       There Is a Genuine Issue of Material Fact Whether Plaintiffs Were Treated
         Differently from Other Similarly Situated Land Owners

First, as explained above, the statute of limitations bars the assertion of claims arising

from acts which occurred outside the limitations period.  Here, the relevant facts which form the

equal protection claim arise from those which occurred during the 1998-1999 ZHB Hearings and

the August 13, 1999 decision of the ZHB itself.  Thus, the relevant inquiry here is whether the

action of the Board of Supervisors through its members in opposing Plaintiffs' validity challenge

and the decision of the ZHB in denying Plaintiffs' validity challenge constitute differential

treatment.  As noted above, in making this inquiry, the Court is not barred from considering

evidence of prior acts.  Prior act evidence was presented to the ZHB by Plaintiffs and Defendant

Board of Supervisors and was incorporated into the August 13, 1999 decision of the ZHB.

Therefore, evidence of prior acts is relevant to whether Defendants' actions violated the Equal

Protection Clause.

Second, Defendants assert that Plaintiffs have failed to establish differential treatment

because they have not identified another owner of similarly situated property that was granted

rezoning by the Board of Supervisors during the limitations period.  In addition, they argue that

Plaintiffs have failed to identify another similarly situated property owner who successfully

brought a validity challenge before the ZHB within the limitations period.  In response, Plaintiffs

assert that there are at least 24 properties which are similarly situated to the Hankin Property and

that each property was approved for rezoning to allow for commercial development.[21]  According

_____

[21]  There were in fact 43 properties in the original agricultural zoning district that were
rezoned from agricultural zoning to other zoning classifications to allow for commercial
development.  Realen's expert, however, focused on 24 properties that were in close proximity to
the Property.  This was presented to the ZHB at the April 15, 1998 hearing during the 1998-1999

23

to Plaintiffs, this evidence at a minimum establishes a genuine issue of material fact regarding whether this differential treatment constitutes an equal protection violation.  The Court agrees.

Although Defendants are correct that Plaintiffs have not identified another similarly situated property which was rezoned or subject to a successful validity challenge during the limitations period, the relevant inquiry here is whether Plaintiffs during the limitations period were treated differently than similarly situated property owners, not whether similarly situated property owners were granted rezoning or successfully presented a validity challenge before the ZHB within the limitations period.  The differential treatment at issue here is the denial of the Realen Validity Challenge by the ZHB, which was supported by the Board of Supervisors, that blocked rezoning of the Property while similarly situated properties were so rezoned.  Since the denial of the validity challenge occurred within the limitations period, Plaintiffs may establish an equal protection violation even if rezoning of another property or a validity challenge to another property's zoning designation occurred outside of this period.

The first step in an equal protection analysis is to ascertain whether the plaintiffs were treated differently from similarly situated entities.  City of Cleburne, Texas v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 394 (3d Cir. 2010).  Under the Equal Protection Clause, entities are "similarly situated . . . when they are alike 'in all relevant aspects.'"  Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).  The Second Circuit has explained that "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  See Toll Bros., Inc. v. Twp. of

---

validity challenge.  (Doc. No. 170, App. 1097-98.)

Moorestown, No. 10-4843, 2011 WL 2259507, at *6 (D.N.J. June 27, 2011) (quoting Curbside,

Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006).  Although apples must be compared to apples,

Perano v. Township of Tilden, No. 09-00754, 2010 WL 1462367, at *10 (E.D. Pa. Apr. 12,

2010), in the context of a land zoning dispute, it is relevant to consider not just the characteristics

of the properties a plaintiff claims are similar, but also the similarities in the eyes of a defendant

which lend support to the claim of a plaintiff.

Plaintiffs have established a genuine issue of material fact as to whether the other 24

properties in the vicinity of the Property are similarly situated.  First, between 1954 and 1982,

each of the 24 properties in the vicinity of the Property were rezoned and approved for

development, including properties bordering the Property.  (Doc. No. 170, App. 1077, 1094-96.)

Second, the 24 properties approved for development were all included in the original agricultural

zoning district.  (Doc. No. 170, App. 1077.)  Third, by 1985, the Property was the only privately

owned undeveloped site that remained zoned for agricultural use despite the fact that it was

suitable for commercial and residential development and surrounded by commercial

development.  (Id.)  Accordingly, there is a genuine issue of material fact as to the similarities of

the properties because each was originally included in the agricultural zoning district and given

the same designation by the Township Board of Supervisors when it created the district.  (See

Doc. No. 169, App. 831-37.)

As noted, Defendants argue that the properties surrounding the Hankin Property are not

similarly situated.  In this regard, Defendants claim as follows:

> the subject property was substantially larger than any of the surrounding
> properties. . . .  None of the other properties were completely surrounded by
> major roads as is the subject property.  None of the other properties had a

working and successful golf course built on them.   None of the other properties have significant elevation changes as the Subject Property.   The subject property, because of its unique location and size, would impose unique and significant adverse impacts on traffic patterns, storm water runoff and congestion if fully developed in the manner contemplated by Plaintiff during the validity challenge.

(Doc. No. 141 at 18-19.)

However, as noted in MFS, Inc. v. DiLazaro, "any two entities will look sufficiently dissimilar if examined at a microscopic level; the court will assume these entities are similar enough for purposes of equal protection."  771 F. Supp. 2d 382, 440-41 (E.D. Pa. 2011) (quoting Holt Cargo Sys., Inc. v. Delaware River Port Auth., 20 F. Supp. 2d 803, 826 (E.D. Pa. 1998). Additionally, the Pennsylvania Supreme Court has held that the size of the tract is not dispositive in determining whether the treatment of a particular property during a zoning validity challenge is differential when compared to other similarly situated properties.  In re Realen Valley Forge Greenes Associates, 838 A.2d 718, 730 (Pa. 2003) ("[T]he size of the tract is not determinative."); Commercial Properties, Inc. v. Peternel, 211 A.2d 514, 519 (Pa. 1965) ("It makes no difference whether it is a 1/4[-]acre lot or a 50[-]acre industrial complex area."). Further, the fact that the property is surrounded by roadways is likewise not dispositive.[22]  The

---

[22]  Defendants' argument that the Property is dissimilar because it is surrounded by roadways was rejected by the Pennsylvania Supreme Court when it held that the zoning restriction constituted impermissible spot zoning.  In re Realen Valley Forge Greenes Associates, 838 A.2d 718, 730 (Pa. 2003).  Specifically, that court stated,

It turns reason and land planning precepts on their head to assert, as the zoning board decision implies, that this tract's *restricted, agricultural zoning* is justified by its ready access to the region's primary arterial roads on every hand. . . . On this record, no characteristic of the Golf Club's property justifies the degree of its developmental restriction by zoning as compared to the district designation and use of all the surrounding lands both within the Township and in the adjoining municipality.  This is spot zoning.

26

reasons advanced by Defendants to show dissimilarity are unpersuasive and do not defeat the fact that Plaintiffs have set forth facts to show the requisite similarity for equal protection purposes among all the properties in issue here.

In addition, Plaintiffs have presented expert testimony from John VanLuvanee that the Property was similarly situated to the surrounding properties.  (Doc. No. 169, App. 813-30.) VanLuvanee based his evaluation primarily on the fact that the Property and the other properties in the vicinity were all part of the original agricultural zoning district.  (Id., App. 828-30.)  In his opinion, in determining whether a property is similarly situated to other properties, it is more relevant to consider the characteristics of the properties at the time they were zoned than the characteristics of the properties when a zoning challenge is filed.  (Id., App. 828.)  The fact that the Township zoned the properties together in the agricultural "holding zone" indicates that the Township viewed the properties to be similarly situated regarding zoning classification.  (Id., App. 829.)  Further, VanLuvanee gives weight to the Pennsylvania Supreme Court's conclusion that there was nothing unique about the Property to support the ZHB decision that agricultural zoning classification provided the only relevant use.  (Id., App. 830.)

Thus, for the above reasons, a reasonable jury could find that the surrounding parcels were similarly situated and on this point a question of fact exists at this stage of the case. Consequently, there is a genuine issue of material fact which precludes granting summary judgment on Count I.

---

Id. (emphasis in original).

2.      There Is a Genuine Issue of Material Fact Whether Defendants Acted with Wrongful Intent

In the December 8, 2004 Opinion denying Plaintiffs' Motion for Summary Judgment, Judge Giles held that Plaintiffs had not "alleged any political motivation or impermissible bias on the part of individual Supervisors as the reason they opposed the Realen Challenge." Hankin Family Partnership, 2002 WL 461794, at *9.  However, Plaintiffs assert that subsequent discovery has produced evidence that the Board of Supervisors acted with the requisite political motivation, undue influence, and impermissible bias.  As previously noted, members of the Board of Supervisors were land developers who may have had an impermissible personal motivation for opposing Plaintiffs' validity challenge.  (Doc. No. 170, App. 948, 999-1015.)  Moreover, before the Board of Supervisors enacted the "overlay zone" on the Hankin Property, former Supervisor Scott wrote a memo which provides as follows:

> [W]e should discourage any real estate speculator, agent or developer who contacts us concerning the possibility of rezoning [the Hankin Property].  Further consideration should be given to placing an overlay on this property *even though the legality of same is doubtful*.

(Doc. No. 167, App. 69; Doc. No. 179 ¶ 26 (emphasis added).)

At various times since the 1960s, the Board of Supervisors made known its intent to maintain the Hankin Property as a golf course or open space.  For example, in 1964, the Board of Supervisors enacted the "overlay zone" on the Property in order to maintain its use as "open space."   However, the Montgomery County Court of Common Pleas held that the ordinance was "null and void."  Valley Forge Golf Club v. Upper Merion Township, 39 Pa. D. & C.2d 181, 189 (C.P. Montgomery County 1965).  Additionally, in 1965 through a brochure distributed to Township residents, the Board of Supervisors made clear that "[it] unanimously believes it is of

28

utmost importance that the [Hankin Property] remain as a green, open area in Upper Merion

Township." In re Realen Valley Forge Greenes Associates, 838 A.2d 718, 723 (Pa. 2003).

In 1981, the Township's planning officials publicly met to discuss a strategy for thwarting

any development plan for the Property.  (Doc. No. 167, App. 196-98.)  Accounts of this meeting

were reported in the *Times Herald* and *Today's Post*.  (Id.)  At this meeting, Supervisor Joan

Kellett publicly admitted, "Let's face it.  This (discussion) is all subterfuge.  We want a golf

course."  (Doc. No. 164 at 15; Doc. No. 167, App. 196.)  In 1984, the Chairman of the Board of

Supervisors represented, "for myself, my goals are simple: (1) I would like to maintain the Golf

Course as it is.  I want to do this not only at this time but also in the future."  In re Realen Valley

Forge Greenes Associates, 838 A.2d at 725.  Finally, during the 1998-1999 Hearings concerning

the validity challenge, two Supervisors made their presence and intentions known to the ZHB

members.   The Chairman of the Board of Supervisors noted, "[the Board of Supervisors and I]

think [the Hankin Property] should continue [as a golf course]."  (Doc. No. 170, App. 1203.)  This

position, when considered in conjunction with the decision of the Pennsylvania Supreme Court

that the restrictive agricultural zoning constituted impermissible spot zoning, raises a genuine

issue as to the intent of the Supervisors and the members of the ZHB.

In addition, regarding the alleged differential treatment of the Board of Supervisors being

the product of a wrongful intent, Defendants appear to rely on their position that the Court cannot

consider actions which occurred prior to August 13, 1999.  However, as noted above, the Court

may consider this evidence.  It is relevant to the motives of the Supervisors in opposing the 1997

validity challenge.  See City of Monterey Dunes v. Del Monte Dunes at Monterey, Ltd., 526 U.S.

687, 721 (1999) (finding that the history of the development process between the property owner

29

and the municipality was relevant in order to show whether the municipality's actions were arbitrary.  The court upheld the use of the following jury instruction: "whether, when viewed in light of the context and protracted history of the development application process, the city's decision to reject a particular development plan bore a reasonable relationship to its proffered justifications.").

Therefore, based on evidence of unjustifiable bias and obstructive behavior stemming in part from Board members being competing developers of the Hankins as described above, a reasonable jury could find that the Board of Supervisors acted with an improper intent in opposing the validity challenge.  Consequently, on this issue, a genuine issue of material fact exists which prevents the Court from granting summary judgment on Count I in favor of Defendants.  See Assocs. in Obstetrics & Gynecology v. Upper Merion Township, No. 03-2313, 2004 WL 2440779, at *1 (E.D. Pa. Oct. 29, 2004) ("[A] genuine issue of material fact exists as to the intent and motive behind the actions taken by [Upper Merion Township].").

Moreover, as noted previously, in view of the decision by the Pennsylvania Supreme Court that the Township engaged in "spot zoning," the inference arises that there may not have been a rational reason for denying the request to rezone the Property, when other similarly situated properties were rezoned for commercial use.  A reasonable jury could conclude that the decision of the ZHB to deny the validity challenge was against the evidence and the product of improper motive.  This creates a genuine issue of material fact which precludes the Court from granting summary judgment in favor of the ZHB on Count I.

3.     There Is a Genuine Issue of Material Fact Whether There Was a Rational
       Basis for Defendants' Actions

If "there is any reasonably conceivable state of facts that could provide a rational basis for the [disparate treatment]," then the equal protection challenge will fail.  Heller v. Doe, 509 U.S. 312, 320 (1993).[23]  Plaintiffs must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Therefore, Plaintiffs must proffer evidence such that a reasonable juror could find that the "different treatment [was] irrational and wholly arbitrary."  Eichenlaub v. Township of Indiana, 385 F.3d 274, 286 (3d Cir. 2004) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

In the instant case, Plaintiffs contend that the Pennsylvania Supreme Court's decision that Defendants' actions in opposing and denying the validity challenge constituted "reverse spot zoning" precludes a finding that Defendants acted with a rational basis.  See In re Realen Valley Forge Greenes Assocs., 838 A.2d 718, 721 (Pa. 2003).  The purported basis for the "freeze" on developing the Property was traffic.  On a previous occasion, Supervisor Volpi admitted that a proposed plan by Plaintiffs for a hotel and golf course would not generate more traffic than the proposed municipal recreation facility, even though the Board of Supervisors denied the proposal on the basis of traffic concerns.  (Doc. No. 170, App. 1034-37.)  The Pennsylvania Supreme Court relied on this same fact in its review of the record before the ZHB.

---

[23]  Defendants note that whether the ZHB had a rational basis for denying the substantive validity challenge is a separate and distinct issue from whether there was a rational basis for the zoning classification because the ZHB has no statutory authority to rezone the Property under 53 P.S. § 10909.1.  Rather, authority to rezone parcels of property rests with the Board of Supervisors under 53 P.S. § 66601.  (Doc. No. 141 at 19-21.)

In June 1984, the land planner for the Township, John Rahenkamp & Associates, concluded that the only negative impact of the proposed development would be the loss of a golf course.  The report noted:

> The impact of the present . . . proposal is obvious in terms of the elimination of the open space, but not as obvious regarding infrastructure impacts. Given sufficient developer contributions and wide reaching traffic studies and plans . . . the road improvements contemplated might more than outweigh the impact of increased cars. . . .  Both the storm water and sewage impacts can be handled. The tax ratables will have a positive fiscal impact on the township. On balance the issue clearly becomes loss of the open space which is an issue of significant public impact or visual loss because so few of the area residents use the Golf Course.

(Doc. No. 170, App. 1034-37); In re Realen Valley Forge Greenes Assocs., 838 A.2d at 725-26.

Additionally, Plaintiffs have proffered evidence that after the Pennsylvania Supreme Court's decision in 2003, Defendants agreed with Realen to allow Plan C, which would have resulted in three to four times more traffic than rejected Plans A or B.  Moreover, properties surrounding the Property were zoned commercial despite the influx of traffic that would be generated.  Based on all of the foregoing evidence, a reasonable jury could infer that Defendants' treatment of Plaintiffs was irrational and arbitrary.

In sum, Plaintiffs have alleged sufficient facts for a reasonable jury to infer that Plaintiffs were treated differently from other, similarly situated property owners for impermissible reasons and there was no rational basis for the different treatment.  For this additional reason, Defendants' Motion for Summary Judgment on the Equal Protection claim set forth in Count I will be denied.

## C.    Counts II and III: Substantive Due Process

In Counts II and III,[24] Plaintiffs allege that Defendants' opposition to and/or denial of the

_____

[24]  As explained above in footnote 16, Count II refers to the decisions of the Board of Supervisors through its members and the ZHB to prevent development of the Property through

1997 validity challenge was a violation of Plaintiffs' constitutional right to substantive due

process.  Defendants move for summary judgment on Counts II and III, arguing that there is no

evidence that Defendants' actions rise to the level of "conscience-shocking" behavior sufficient to

support a due process claim.  The Court disagrees.  In light of the evidence produced in discovery

and drawing all reasonable inferences from that evidence in favor of Plaintiffs, a reasonable jury

may infer that Defendants acted in a manner that shocks the conscience.  Accordingly, the Court

will deny Defendants' Motion for Summary Judgment as to Counts II and III.

The Due Process Clause of the Fourteenth Amendment "contains a substantive component

that bars arbitrary, wrongful government action regardless of the fairness of the procedures used to

implement them."  MFS, Inc. v. DiLazaro, 771 F. Supp. 2d at 438 (quoting Zinerman v. Burch,

494 U.S. 113, 125 (1990) (internal quotations omitted).  As noted by the Third Circuit,

substantive due process "is an area of law famous for its controversy, and not known for its

simplicity."  DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 598 (3d Cir. 1995) (internal

quotation omitted).

To establish a violation of substantive due process in the context of a land use dispute, a

plaintiff must establish that (1) it has a property interest protected by the Fourteenth Amendment,

and (2) it was deprived of that interest by behavior of a local official which "shocks the

conscience."  Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008); United Artists Theatre Circuit,

---

agricultural zoning in order to depress its fair market value so that the Township could acquire
the Property at a lower cost.  Count III refers to the action of the Township restricting use of the
Property through agricultural zoning to preserve it as a golf course or open space.  This Count
also refers to the decisions of the ZHB rejecting the Acorn and Realen validity challenges in
order to further the policy of the Township to restrict development of the Property.  (See Doc.
No. 7 ¶¶ 68-81.)

Inc. v. Twp. of Warrington, 316 F.3d 392, 399-401 (3d Cir. 2003).  "The conduct must be 'intended to injure in some way unjustifiable by any government interest.'"  Newman v. Beard, 617 F.3d 775, 782 (3d Cir. 2010) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)).  The Third Circuit has held that "[l]and-use decisions are matters of local concern and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives."  United Artists, 316 F.3d at 402.  Therefore, federal courts apply the "shocks the conscience" test to avoid converting a court into super zoning boards of appeals.  Id. at 402.  See also Perano v. Township of Tilden, 2010 WL 1462367, at *7.

In evaluating a substantive due process claim, a court must consider "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Lewis, 523 U.S. at 847 n.8.  As explained in MFS v. DiLazaro, the Third Circuit has held that three standards may support a finding that government action "shocks the conscience":  (1) deliberate indifference; (2) gross negligence or arbitrariness; or (3) intent to cause harm.  771 F. Supp. 2d 382, 439 (E.D. Pa. 2011) (citing Phillips v. County of Allegheny, 515 F.3d 224, 241 (3d Cir. 2008)).  The inquiry and the appropriate standard "depend[s] largely on the amount of time that the official had to determine how to act."  Adhi Parasakthi Charitable, Medical, Educational, and Cultural Society of North America v. Twp. of West Pikeland, 721 F. Supp. 2d 361, 379 (E.D. Pa. 2010) (citing Phillips, 515 F.3d 224, 241).  Deliberate indifference may be appropriate "where the actor had full opportunity to examine the situation and make a decision."  Id.  However, during circumstances where the actor makes a split-second decision, an intent to deprive the individual of constitutional rights may be more appropriate.  Phillips, 515

34

F.3d 224, 240-41.  "[T]he measure of what is conscience shocking is no calibrated yard stick," and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another."  Kaucher, 455 F.3d at 425-26 (quoting Lewis, 523 U.S. at 847, 850).  Indeed, the question of whether a given action "shocks the conscience" has an "elusive" quality to it.  Estate of Smith v. Marasco, 318, F.3d 497, 509 (3d Cir. 2003).  Thus, whether conduct complained of "shocks the conscience" will depend on the facts of the case.  United Artists, 316 F.3d at 399-400.

In Eichenlaub v. Township of Indiana, the Third Circuit explained that the "shocks the conscience" test is satisfied only by the most "egregious" official conduct.  385 F.3d 274, 285 (3d Cir. 2004) (quoting Lewis, 523 U.S. 833, 847 (1998)).  The most "egregious" official conduct could be demonstrated through evidence of "corruption or self-dealing."  See Eichenlaub, 385 F.3d at 286 (intimating that the substantive due process analysis may have produced a different result if there were allegations of "corruption or self-dealing"); see also Perano, 2010 WL 1462367, at *8 ("Plaintiff makes no allegation of corruption or self-dealing. . . .  If Plaintiff made any allegations demonstrating corruption or self-dealing by Defendants, or interference with constitutionally protected conduct, the Amended Complaint might survive a Motion to Dismiss.").  See also Dev. Group, LLC v. Franklin Twp. Bd. of Supervisors, No. 03-2936, 2004 WL 2812049, at *14 (E.D. Pa. Sept. 24, 2003) (denying a motion to dismiss where plaintiff alleged that officials delayed approval for development while attempting to "buy off" plaintiff in violation of Pennsylvania law); Assocs. in Obstetrics & Gynecology v. Upper Merion Twp., 270 F. Supp. 2d 633, 656 (E.D. Pa. 2003) (holding that selective enforcement of a zoning ordinance against an abortion clinic with the intention of "harming Plaintiffs' business interests and . . . restricting their practice of lawful medical procedures" implicated a substantive due process violation).  Thus,

evidence of corruption or self-dealing or an intent to harm by interfering with constitutionally

protected conduct can rise to the level of conscience-shocking behavior.

1.    There Is a Genuine Issue of Material Fact Whether Actions of the Board of
      Supervisors and the ZHB Deprived Plaintiffs of Substantive Due Process

       a.    Plaintiffs' Property Interest Is Protected by the Fourteenth
             Amendment

As a threshold matter, all parties concur that Plaintiffs have a property interest protected

by the Fourteenth Amendment.  An owner's use and enjoyment of land is protected by substantive

due process.  DeBlasio v. Zoning Hearing Bd. of Adjustment, 53 F.3d 592, 601 (3d Cir. 1995),

cert. denied, 516 U.S. 937 (1995) ("in the context of land use regulation, that is, in situations

where the governmental decision in question impinges upon a landowner's use and enjoyment of

property, a land-owning plaintiff states a substantive due process claim . . . .").  Plaintiff Timoney,

acting as receiver for the Hankin estate, was appointed by the court to liquidate the Hankin assets,

including the Property at issue.  (Doc. No. 149, Ex. O at 8).  Plaintiffs therefore have a protected

interest in the Property, and this prong of the substantive due process analysis is satisfied.

       b.    There is Sufficient Evidence to Allow a Reasonable Jury to
             Conclude that the Actions of Defendants "Shock the Conscience"

The next step here is to determine whether Defendants' actions were so egregious as to

"shock the conscience."  All reasonable inferences arising from viewing the evidence in the light

most favorable to Plaintiffs show that members of the ZHB, in collusion with members of the

Board of Supervisors, engaged in egregious conduct in many ways.[25]  Here, Plaintiffs have

_____

[25]  As has been noted by other courts, the history of a defendant's misconduct in
constitutional land use cases provides the fact finder with a framework for considering whether
defendants have engaged in conscience-shocking behavior.  For example, the United States
Supreme Court, in City of Monterey Dunes v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687

proffered evidence that shows more than improper motive or bad faith.  From the facts Plaintiffs

have presented, a genuine issue of material fact exists as to whether Defendants acted with

deliberate indifference, arbitrariness, or an intent to harm the rights of Plaintiffs.  The record is

replete with evidence that could allow a reasonable jury to conclude that the actions of Defendants

are so egregious that they "shock the conscience."

At the outset, the Court notes that even the Pennsylvania Supreme Court found that the

actions of Defendants constituted an arbitrary exercise of police power.  In re Realen Valley Forge

Greenes Associates, 576 Pa. 115, 119.  Specifically, that court held:

> We granted allowance of appeal to consider the validity of the agricultural zoning of
> a tract located in the heart of one of the most highly developed areas in the region,
> entirely surrounded by an urban landscape, and immediately adjacent to what is
> currently the world's largest shopping complex at one discrete location: the Court
> and the Plaza at King of Prussia.  We hold that this agricultural zoning, designed to
> prevent development of the subject property and to 'freeze' its substantially
> undeveloped state for over four decades in order to serve the public interest as 'green
> space', constitutes unlawful 'reverse spot zoning' beyond the municipality's proper
> powers.  Therefore, we reverse the order of the intermediate appellate court
> upholding the validity of the legislation.
>
> *   *   *
>
> [S]pot zoning . . . is an arbitrary exercise of police powers that is prohibited by our
> Constitution.

Id. at 119.

Moreover, the Pennsylvania Supreme Court found the fact finding of the ZHB "troubling,"

---

(1999), noted the "torturous and protracted history of attempts to develop the property," and
found this long history entirely relevant to resolve the constitutional claims.  In that case, the
Court held that it was proper to direct the jury to consider whether the plaintiff had been denied
all economically viable use of its property, and whether the denial of an application for rezoning
substantially advanced a legitimate public interest.  Id. at 699.  With these principles in mind, this
Court notes here the long history of Defendants' conduct toward Plaintiffs which influenced the
decision not to rezone the Property and to deny Plaintiffs' validity challenge.  Indeed, the history
of Defendants' conduct toward Plaintiffs was referred to and incorporated by the ZHB in its
August 13, 1999 decision denying the Realen Validity Challenge.

intimating that an inference arises as to whether the decision of the ZHB was arbitrary in light of the evidence before it.  Id. at 138.  In expressing its concerns, the court stated:

> We will note, however, that the zoning board's fact finding in this case includes particularly troubling examples of the difficulty Realen describes.  For example, the zoning board here found as a pivotal fact that '[t]he subject property can be used and developed with single family detached dwellings, which are permitted by right on the subject property.'  Factual Finding No. 68, [Z]oning [B]oard's decision at 10.  The Township's expert land planner testified during the course of the board's hearing just to the contrary including the direct conclusion that none of the uses permitted by right on the tract are 'practical.'  R.R. 460a.  Realen's expert witnesses testified unambiguously that single-family detached homes are not a feasible use for this intensely developed, commercial area of the Township.  See R.R. 391a-393a.  Therefore, the zoning board's conclusion must be predicated on disbelief not only of the testimony of the challenger's experts but of the Township's experts offered in support of the ordinance as well.

576 Pa. at 137-38.  These concerns notwithstanding, the court stated that it did not need to examine the nature of the fact-finding process in order to hold that the actions of Defendants constituted impermissible spot zoning.  Id.  Instead, the court stated that although it may someday be presented with an issue that would require it to look into the contours of a zoning hearing board's fact-finding process, it did not need "to decide whether a zoning hearing board's performance of its fact-finding function deprived the applicant of a fundamentally fair proceeding and whether the particular necessary findings of the board, although minimally supported by record evidence, capriciously and without reasonable explanation disregard overwhelming evidence having a contrary import."  Id. at 138.

Here, Plaintiffs have produced evidence that could lead to the conclusion that despite sufficient evidence before the ZHB suggesting that Plaintiffs' right to substantive due process was violated, the ZHB nonetheless disregarded such evidence and acted with deliberate indifference,

38

arbitrariness, or an intent to harm the rights of Plaintiffs.[26]  As discussed above, the Township

allowed development of at least 24 neighboring and bordering properties while denying the

Plaintiffs' rezoning requests.  Also, during the Acorn and Realen Challenges before the ZHB, the

Chairman of the Board of Supervisors admitted that his conditions for the development of the

Property were "arbitrary."  (Doc. No. 170, App. 969-70.)  Additionally, Supervisor Kellett, during

a public meeting of the Township's planning officials in preparation for rezoning requests of the

Property, stated that any discussion regarding the zoning was mere "subterfuge [because we] want

a golf course."  Moreover, statements of Township planning officials reveal that several in charge

of zoning and planning were concerned with the legality of the zoning designation of the Property.

Lastly, as noted by the Pennsylvania Supreme Court, the ZHB's decision ignores the advice of the

Township's expert John Rahenkamp as well as the opinion of Realen's experts.  In his 1984

analysis of the zoning treatment of the Property, Rahenkamp stated the he "cannot excuse the

[T]ownship from responsibility for not moving forward on the critical planning to begin dealing

with the realities of this intense core area. . . ."  (Doc. No. 168, App. 312-27.)

Moreover, before the ZHB during the validity challenge was evidence suggesting that

members of the Board of Supervisors were concerned with the lawfulness of their conduct.  For

example, during the 1984 Acorn Challenge, Chairman Ralph Volpe expressed concern that "[e]ven

if this case went all the way to the State Supreme Court and we prevailed, there is no guarantee

that, in the next lawsuit, we will win."  (Doc. No. 168, App. 310-11.)  Much later, at a 2005 Board

of Supervisors Meeting, Volpe stated, "As I said back in the '80s, one of these days we're going to

---

[26]  The "intent to harm" standard involves the making of quick decisions by public
officials, and a reasonable jury could conclude that such decisions were made here and were
influenced by prior decisions of the Board of Supervisors.

get zonked by a Court and we finally have and now we've got to bite the bullet and the question is how do we bite it and where do we go."  (Doc. No. 168, App. 621-22.)

Plaintiffs also have produced evidence inferring that the Board of Supervisors' interests were intertwined with the interests of the ZHB and its members, suggesting a high level of collusion between the two bodies and self-dealing by members of the Board of Supervisors.  First, the Chairman of the ZHB during the Realen Challenge, Salvatore Bello, Esquire, was later appointed by the Board of Supervisors to serve as solicitor for the Board of Supervisors.  Notably, Bello's law partner, Robert McGrory, was the solicitor for the ZHB during the Realen Validity Challenge hearings.  Also, both Boards were represented by the same attorney, Alan Boroff, Esquire, during the appeal of the August 13, 1999 decision.  Before Boroff represented both Boards on appeal, he was the Solicitor for the Board of Supervisors during the Realen Validity Challenge hearings.[27]

Second, two members of the Board of Supervisors attended the ZHB substantive validity challenge, Chairman Robert Clifton and Member Ralph Volpe.  Supervisor Volpe sat at the presiding adjudicatory bench, alongside the three members of the ZHB.  Supervisor Volpe noted that he was the liaison for the Board of Supervisors and that "since the Township will be a party, it

---

[27]  Defendants argue that the case against the Board of Supervisors and the ZHB must be assessed separately.  (Doc. No. 141 at 10-12.)  Defendants also assert that evidence proffered by Plaintiffs suggesting that the Board of Supervisors exerted undue influence on the ZHB is not sufficient to survive summary judgment.  (Doc. No. 178 at 5-8.)  These arguments are not persuasive.  The Court agrees with Plaintiffs that a jury may consider evidence suggesting that the Board of Supervisors and the ZHB acted together in making decisions regarding the development and use of the Property.  From the evidence here it can be inferred that the Board of Supervisors and the ZHB acted together in making decisions regarding the proper zoning of the Property.  Therefore, a genuine issue of material fact exists as to whether the behavior of the Board of Supervisors and members of the ZHB amounted to improper collusion in a way that contributed to a violation of substantive due process.

might be appropriate if I step down from the stage and sit in the audience." (Doc. No. 170 at 1052-53.) Third, near the close of the March 17, 1999 ZHB hearing, the Chairman of the Board of Supervisors, Robert Clifton, gave testimony in his capacity as Chairman and as a concerned citizen. He noted, "[the Board of Supervisors and I] think [the Hankin Property] should continue [as a golf course]." (Doc. No. 170 at 1203.) This statement was made after the Township's own expert, John Rahenkamp, testified that he believed the Township could not require the Hankin Property be kept as open space through zoning. (Doc. No. 170 at 1157.)

Other aspects of the record raise genuine issues of material fact that support the inference of possible self-dealing by Defendants. The fact that some Supervisors "owned and developed similarly situated property" (Doc. No. 164 at 39) in combination with other evidence proffered by Plaintiffs, such as, for example, Rahenkamp's testimony, create a genuine issue of material fact on the existence of such self-dealing. As already described, Supervisors were owners of surrounding properties. While sitting as a Township Supervisor, Supervisor Volpi was a developer and builder who owned real estate in Upper Merion Township. He was a builder of the Sheraton Hotel, which is situated near the Property in Upper Merion. Moreover, Supervisor Volpi built the hotel for a competitor of the Hankins, Leon Altemose. (Doc. No. 165 ¶ 94.) In addition to his involvement with the Sheraton Hotel construction, Supervisor Volpi developed and built the Continental Arms Apartments, one of the original properties in the agricultural zoning district that was subsequently rezoned. (Doc. No. 170 at 999-1015, 1028.) Two Supervisors were involved with the Continental Arms Apartments development: Supervisor Volpi and Supervisor Blain Scott, both partners in this endeavor. (Doc. No. 165 ¶ 19.) Furthermore, in 1964, Supervisor Scott wrote a memo stating, "we should discourage any real estate speculator, agent or developer who contacts us concerning

the possibility of rezoning [the Hankin Property].  Further consideration should be given to placing an overlay on this property *even though the legality of same is doubtful*."  (Doc. No. 167, App. 69 (emphasis added).)  Even more recently, during the Realen Challenge, Supervisor Ralph Volpe met with the president of Kravco, a Hankin competitor and developer of the King of Prussia Mall, to discuss possible land development plans.  (Doc. No. 169, App. 880-84.)

Finally, there is sufficient evidence for a jury to conclude that Defendants acted pretextually in relying on traffic congestion as a reason to oppose or deny the Realen Validity Challenge.  In the August 13, 1999 decision, the ZHB stated, "The applicant's proposed conceptual plan would have a severe negative impact on the roadways surrounding the subject property."  Yet, as noted, the Defendant Board of Supervisors later approved Plan C, which was estimated to generate 2-3 times more traffic than Plans A or B.  Further, once the Board of Supervisors began discussing Plan C, they did not conduct additional traffic studies.  Moreover, as Plaintiffs note, although Defendants have long cited traffic concerns as a reason for opposing requests to rezone the Property and denying validity challenges, the record indicates that they have nonetheless allowed development of other properties that were originally in the agricultural zoning district, which resulted in increased traffic.  This development has resulted in creating the very thing that Defendants were allegedly trying to avoid — a King of Prussia area known for its traffic congestion.  These facts, plus public statements by members of the Board of Supervisors that they wanted the Property to remain a golf course while approving commercial rezoning of contiguous and nearby properties, allow a jury to infer that both Boards used traffic congestion as a pretext to deny the Realen Validity Challenge, and that because both Boards colluded, the ZHB merely followed the lead of the Board of Supervisors in relying on the traffic congestion pretext.

42

The above recitation of facts highlights examples included in the record that could allow a reasonable jury to conclude that Plaintiffs' dispute is not merely a disagreement about the zoning designation of their property, but instead a violation of their substantive due process right.  A reasonable jury could conclude based on this evidence and the interplay between the Board of Supervisors and the ZHB that conscience-shocking behavior sufficient to establish a due process violation has been proven.  Reasonable inferences from the facts show that the motivation of Defendants was to depress the value of the Property so that the Township could acquire it at an unjust price to operate a golf course, to assist other developers owning properties in the original agricultural zoning district by granting rezoning to allow commercial use which inflated the value of their properties as opposed to the Property, to eliminate competition to projects developed by members of the Board of Supervisors and to justify this conduct with pretextual reasons to the financial detriment of Plaintiffs.  The evidence of unjustifiable conduct and self-dealing raises an inference that Defendants' decisions about the Property were not motivated by proper land use planning, but instead were based upon deliberate indifference to, arbitrary treatment of, or intent to cause constitutional harm to Hankin's property interest.

Therefore, a genuine issue of material fact exists as to whether Defendants engaged in egregious conduct through deliberate indifference, arbitrariness, or intent to harm.  Where there are genuine issues of material fact regarding whether Defendants' conduct "shocks the conscience," summary judgment is precluded.  See Lonzetta Trucking & Evacuating Co. v. Schan, 144 Fed. App'x 206, 212 (3d Cir. 2005).  Consequently, the Court will deny the Motion for Summary

Judgment with respect to Counts II and III.[28]

### D.    Counts V and VI: Fifth Amendment Takings Claims

Defendants assert that the takings claims asserted in Counts V and VI are not ripe for

adjudication.  According to Defendants, the Fifth Amendment requires that a plaintiff seek

compensation by availing itself of the statutory remedy afforded under state law prior to filing suit

in federal court.  Here, Plaintiffs are pursuing compensation under the Pennsylvania Eminent

Domain Code.[29]  Plaintiffs' claims are currently pending in state court.  Thus, according to

---

[28]  Plaintiffs also aver that there is sufficient evidence of race-based animus and that the jury could infer racial motive in Defendants' actions in considering the conscience-shocking equation.  (Doc. No. 165, ¶¶ 6, 74, 99, 117, 158, and 160.)  In Marjac LLC v. Trenk, 380 F. App'x 142, 147 (3d Cir. 2010) (non-published), the Third Circuit held that:

> [F]or purposes of summary judgment, plaintiffs' presentation of evidence that the Township Attorney's selective enforcement of municipal zoning laws was motivated by antipathy toward Italians—conduct which may shock the conscience—creates a genuine issue of material fact sufficient to survive summary judgment. . . . [T]herefore, [the district court] erred in granting summary judgment . . . on the plaintiffs' substantive due process claims.

Id.
In Marjac, the plaintiff adduced more than mere conclusory statements that the Township selectively enforced zoning laws based on animus toward Italians.  In Marjac, the plaintiff proffered numerous witnesses that heard the Township's attorney make derogatory comments about Italians and their connection to the mafia.  Specifically, one witness testified that the Township attorney made "general comments that Italians aren't the best of people, they're connected to the mob" in a conversation regarding the plaintiff.  Id.
In the instant case, unlike in Marjac, Plaintiffs have not proffered any evidence that members of the Zoning Hearing Board made any invidious statements based on race, national origin, or class during the substantive validity challenge.  Although Plaintiffs have proffered evidence that the Board of Supervisors may have opposed the rezoning of the Hankin Property based on letters written by citizens containing racial or class-based undertones (see, e.g., Doc. No. 165 ¶ 74), there is no evidence that the Board acted on these letters or that the ZHB's decision on the validity challenge was motivated by racial bias.  Therefore, Plaintiffs have not established a genuine issue of material fact with regard to racial animus.

[29]    26 Pa. Cons. Stat. § 502 (2010) provides for the following procedure:

44

Defendants, the claims contained in Counts V and VI are not ripe for adjudication and the Court should grant summary judgment in their favor.

Plaintiffs argue that Counts V and VI allege a taking for <u>private</u> use.  According to Plaintiffs, a claim of taking for private use is unlawful regardless of whether just compensation will be paid.  Plaintiffs submit that the pendency of the state suit seeking relief under the Pennsylvania Eminent Domain Code should not prevent the claims in Counts V and VI from being adjudicated here.

The Court agrees with Defendants that Plaintiffs are required to seek compensation by exhausting their state statutory remedy before the federal takings claims become ripe.  <u>See</u> <u>Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172, 186-88 (1985).  Recently, the Third Circuit explained,

> [T]he fundamental basis of the <u>Williamson</u> opinion [is that] simply put, until just compensation has been denied, an owner has not suffered a constitutional injury and does not have a federal takings claim.  <u>See</u> [<u>Williamson</u>, 473 U.S.] at 194 n.13

---

> (c) CONDEMNATION WHERE NO DECLARATION OF TAKING HAS BEEN FILED.--
>
> (1) An owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) setting forth the factual basis of the petition.
>
> (2) The court shall determine whether a condemnation has occurred, and, if the court determines that a condemnation has occurred, the court shall determine the condemnation date and the extent and nature of any property interest condemned.
>
> (3) The court shall enter an order specifying any property interest which has been condemned and the date of the condemnation.

("[B]ecause the Fifth Amendment proscribes takings *without just compensation*, no constitutional violation occurs until just compensation has been denied.").

R & J Holding Company v. Redevelopment Authority of the County of Montgomery, No. 10-1047, 2011 WL 6117857, at *9 (3d Cir. 2011) (precedential opinion).  This explanation suggests that whether the alleged taking is for a public or private purpose, until just compensation has been denied, a federal takings claim is not ripe.  R & J Holding Company involved takings claims against public and private actors, and the Third Circuit did not distinguish between the two types of takings claims in stating that just compensation must be denied before there is a constitutional injury under the Fifth Amendment.  See generally id. at *1-2.

As noted above, by agreement of the parties, the Court of Common Pleas of Montgomery County issued an order staying the state court inverse condemnation proceedings on December 17, 2004, and this stay has not been lifted.  No decision has been rendered on Plaintiffs' claim for just compensation.  Consequently, this Court will stay any proceedings on Counts V and VI until a final judgment is rendered on the takings claims in state court.[30]

---

[30]  In the March 22, 2002 Opinion and Order, Judge Giles stayed the adjudication of Counts V and VI based on the abstention doctrine of Colorado River.  Hankin Family P'ship, No. 01-1622, 2002 WL 461794 (E.D. Pa. Mar. 22, 2002) (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)).  Both parties appealed the Order to stay.  The Third Circuit first reviewed Judge Giles's finding that the concurrent federal and state court proceedings are "duplicative."  Regarding Judge Giles's finding, the Third Circuit specifically stated that the proceedings were "parallel" and not "duplicative."  While the Third Circuit agreed with the analysis conducted by Judge Giles, it remanded the case for "adequate consideration under the elements of Colorado River."  Timoney, 66 F. App'x at 406 (3d Cir. 2003).  As noted above, on September 12, 2003, before Judge Giles could address the Colorado River factors, the parties stipulated that the action should be stayed until such time as the Pennsylvania Supreme Court renders a decision in In re Realen Valley Forge Greenes Associates.  (Doc. No. 29.)  However, since this Court is continuing the stay on Counts V and VI, a discussion of the Colorado River abstention factors is appropriate.

The general rule is that "the pendency of an action in the state court is no bar to

46

## V.    CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment

as to Counts I, II, and III, and deny the Motion without prejudice as to Counts V and VI, staying the

adjudication of Counts V and VI until they become ripe for disposition in federal court.

An appropriate Order follows.

---

proceedings concerning the same matter in the Federal court having jurisdiction." <u>Colorado River</u>, 424 U.S. at 817.  However, <u>Colorado River</u> abstention permits a district court, in exceptional circumstances, to abstain from exercising jurisdiction over a federal claim in light of a parallel state-court proceeding.  <u>Colorado River</u> abstention is appropriate only where parallel state and federal litigation are "truly duplicative."  Further, a federal court is required to consider the following six factors to determine whether "exceptional circumstances" exist, warranting abstention.  The six factors are:

> (1) which court first assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties.

<u>Timoney v. Upper Merion Twp.</u>, 66 F. App'x 403, 406 (3d Cir. 2003).  As the Third Circuit recognized, the claims in Counts V and VI and the state court inverse condemnation proceeding are "parallel."  Therefore, as noted, the Court will consider whether the <u>Colorado River</u> factors warrant abstention in this case.

The inverse condemnation proceeding began on March 30, 2001 in state court, prior to the filing of this case on April 3, 2001 in federal court.  There is a strong desire to avoid piecemeal litigation as the state court has not yet reached a decision in the inverse condemnation proceedings, and the case still is pending in the Court of Common Pleas of Montgomery County.  Although the federal forum is not inconvenient, the state can adequately protect the interests of the parties.

Moreover, under federal law, before the takings claims become ripe, Plaintiffs are required to seek compensation through a state condemnation proceeding.  If Plaintiffs are successful in the inverse condemnation proceedings, then they will receive compensation for the taking.  If Plaintiffs are unsuccessful, then the takings claims become ripe and this Court may consider the claims under federal law.  A weighing of these factors points in favor of staying Counts V and VI in this case and permitting the state inverse condemnation case to be litigated first.